CLERKS OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
8/20/2018
JULIA C. DUDLEY, CLERK
BY: s/ SUSAN MOODY
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| Vernon T.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:17-cv-96 |
| | ) | |
| v. | ) | |
| | ) | |
| NANCY A. BERRYHILL, | ) | By: Hon. Robert S. Ballou |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| | ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION

Plaintiff Vernon T. ("Vernon") filed this action challenging the final decision of the Acting Commissioner of Social Security ("Commissioner") determining that he was not disabled and therefore not eligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Specifically, Vernon alleges that (1) the Administrative Law Judge ("ALJ") failed to find as severe impairments his left shoulder impairment, leg pain and numbness, chronic pain syndrome, and right wrist and thumb impairments and to consider the functional limitations from those impairments in the RFC; (2) the ALJ improperly discounted his credibility; and (3) new evidence submitted to the Appeals Council necessitates remand. I conclude that substantial evidence supports the Commissioner's decision on all grounds. Accordingly, I **RECOMMEND DENYING** Vernon's Motion for Summary Judgment (Dkt. 10), and **GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 12).

---

[1] Due to privacy concerns, I am adopting the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States that courts use only the first name and last initial of the claimant in social security opinions.

## STANDARD OF REVIEW

This Court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Vernon failed to demonstrate that he was disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Vernon protectively filed for DIB on May 10, 2013, claiming that his disability began on March 11, 2013. R. 186–87. The Commissioner denied the application at the initial and reconsideration levels. R. 79, 92. On May 18, 2016, ALJ Thomas W. Erwin held an administrative hearing to consider Vernon's disability claim. R. 47–74. Vernon was represented by an attorney at the hearing, which included testimony from Vernon and vocational expert Asheley Wells. Id.

On February 12, 2016, the ALJ entered his decision analyzing Vernon's claim under the familiar five-step process,[3] and denying Vernon's claim for disability. R. 36–46. The ALJ found

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform

that Vernon suffered from the severe impairments of degenerative disc disease with a history of fusion surgeries, obesity, hypertension, and situational depression. R. 38. The ALJ also found that Vernon had right wrist tenosynovitis and left shoulder inflammation of the sternoclavicular joint. The ALJ found these conditions non-severe because Vernon did not claim that they caused any physical limitations or other functional impairments which lasted more than 12 months. The ALJ determined that Vernon retained the residual functional capacity ("RFC") to perform light work with the following restrictions: (1) cannot climb ladders, ropes, or scaffolds; (2) can occasionally push and pull and reach overhead with his upper extremities; (3) can occasionally climb, stoop, kneel, crouch, and crawl; and (4) can perform simple, routine tasks which do not require more than occasional exposure to other hazards and allow for regularly scheduled breaks. R. 40. The ALJ determined that Vernon cannot return to his old job as an institutional investigator, but he can work jobs that exist in substantial numbers in the national economy, such as cashier, gate guard, and ticket taker. R. 45–46. Thus, the ALJ concluded that Vernon was not disabled. R. 46.

Vernon appealed the ALJ's decision to the Appeals Council and submitted additional evidence for consideration, but his request for review was denied. R. 1–3. This appeal followed.

## ANALYSIS

Vernon argues that (1) the ALJ failed to find as severe his left shoulder impairment, leg pain and numbness, chronic pain, and right wrist and thumb impairments or to account for the

---

other work. Heckler v. Campbell, 461 U.S. 458, 460–62 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

3

limitations from those conditions in the RFC; (2) the ALJ improperly discounted his credibility; and (3) new evidence submitted to the Appeals Council necessitates remand.

**Medical Evidence**

Vernon has a history with degenerative disc disease and has undergone a cervical diskectomy and fusion at C6-7 and a lumbar fusion at L4-5, L5-S1 prior to the relevant period. He also had a history of right leg cellulitis which Wayne Calvin Reynolds, M.D. had treated. In October 2012, Dr. Reynolds diagnosed Vernon with cellulitis in his right leg which he had for a couple of months. R. 384. Vernon informed Dr. Reynolds that he has suffered from multiple episodes of cellulitis affecting both legs in the past year. Id. Dr. Reynolds prescribed Ciprofloxacin and TMP-SMZ DS. Id. Later that month, Vernon returned to Dr. Reynolds for right leg pain and edema. R. 287. Dr. Reynolds found that Vernon's "superficial and deep venous structures augment and compress normally" and found "[n]o evidence of superficial thrombophlebitis." Id.

Vernon returned to Dr. Reynolds in December 2012 for his right leg cellulitis. R. 383. Vernon explained that his symptoms improved when using prescription medications, but his right leg has become sore, tight, and burning since his prescriptions ran out. Id. Vernon explained that his knees have been aching, especially when using stairs. Id. Dr. Reynolds found that Vernon's legs have mild edema, his right leg is tender to palpation, and that his right leg is slightly more swollen than his left. Id. Later that month, Vernon returned to Dr. Reynolds, explaining that his cellulitis had resolved without antibiotics. R. 382.

On March 27, 2013, Vernon saw J. Travis Burt, M.D., at Highlands Neurosurgery for back pain, neck pain, and left leg pain that radiates down his calf. R. 326. Dr. Burt reviewed Vernon's progress since the cervical and lumbar fusion surgeries, but Vernon reported that in the

4

previous few weeks, he had developed an increased back and left leg pain which he rated as 6/10. Id. Dr. Burt found that Vernon suffers from "back pain as well as left leg pain along the L5 distribution with a history of previous L4-5, L5-S1 ALIF." Id. Dr. Burt administered injections for Vernon's lumbar spine and prescribed Robaxin and Lortab. Id.

On April 2, 2013, Vernon received a left L3-4 interlaminar epidural injection for back pain that radiated into his left leg. R. 324. Vernon was stable after the injection. Id.

Vernon saw Ashlee Medley, PT, on April 30, 2013 for physical therapy. R. 327–32. Ms. Medley reported that Vernon's pain in the lumbar spine "runs into [his] left buttock and radiates [with] standing into the proximal thigh and lateral thigh. [Vernon s]tates both big toes feel cold." R. 327. Vernon's gait was normal. R. 328. Ms. Medley stated that Vernon's potential for rehabilitation was "good" and prescribed therapeutic exercises, a home exercise plan, heat and ice therapy, augmented soft tissue mobilization, and electronic muscle stimulation. R. 330–31. After twelve physical therapy sessions, Vernon was discharged on July 30, 2013 because his physical therapy prescription expired. R. 373. Ms. Medley noted that Vernon's treatment goals were "unattainable." Id.

On May 7, 2013, Vernon reported low back and lower thoracic pain to Dr. Burt, explaining that "he is unable to function." R. 316. Physical examination revealed full strength and range of motion in the upper and lower extremities and no bony deformity, edema, erythema, or ecchymosis of the cervical or lumbar spine. Id. Dr. Burt referred Vernon to physical therapy, offered him a lumbar support device, and instructed him to start a home exercise program. R. 316–17.

Vernon followed up on June 4, 2013, reporting that physical therapy did not alleviate his pain and that he continued to suffer from back pain that radiated posteriorly down his left leg to

5

his knee. R. 314. Dr. Burt found full strength in Vernon's lower extremities. Id. Dr. Burt prescribed Robaxin for pain and spasms and Neurontin for Vernon's left leg pain, and encouraged him to speak with pain management. Id.

On June 18, 2013, Vernon saw pain management specialist Thomas G. Sutton, M.D. R. 419–21. Vernon reported back pain, but also noted "some newer numbness and weakness along the left anterior thigh . . . and pain radiating down the left buttock into the left anterior thigh." R. 419. Dr. Sutton found that Vernon was positive for left leg pain, burning, and numbness radiating from the left buttock over the knee. R. 420. Dr. Sutton ordered an EMG nerve conduction study for pain in the left quadriceps. R. 421. Dr. Sutton also increased the Neurontin dosage and prescribed hydrocodone. Id. A thoracic MRI on July 8, 2013 showed no bony or soft tissue abnormality with only tiny disc bulges at T3-4 and T5-6. R. 425.

Vernon returned to Dr. Burt in July 16, 2013, reporting persistent pain in his left leg. R. 313. Dr. Burt described Vernon's pain as "going into the posterior aspect of his left lower extremity and also into the anterior thigh and at times with numbness into the great toe on the left." Id. Dr. Burt noted that Vernon continued to work despite his pain. Id.

On October 18, 2013, Vernon received an SI joint injection, explaining that they had helped him in the past. R. 432.

On November 6, 2013, Vernon returned to Dr. Sutton, reporting decreased back pain but new pain in his left shoulder. R. 458. Dr. Sutton found "some crepitus with rotation of the left shoulder at the sternoclavicular joint. [Vernon's] Spurling's test is positive on the left, creating a stabbing pain to about the elbow in the left upper extremity." R. 459. Dr. Sutton prescribed a small dose of Lortab, and stated that he would eventually like to conduct an MRI of the

6

sternoclavicular junction. Id. On November 27, 2013, Vernon reported to Stephanie R. Branham, FNP, that he was still experiencing left leg numbness, but that he was able to exercise. R. 455.

Vernon saw Paul Morin, M.D., at West Ridge Orthopaedic & Surgical Specialists on February 25, 2014. R. 465–66. Dr. Morin prescribed a Medrol Dose Pack for Vernon's left shoulder pain. R. 465. Vernon followed up with Dr. Morin in March 2014, and Dr. Morin explained that "[t]he Medrol Dose Pack was very beneficial in relieving the swelling as well as the associated pain. He is no longer having pain in his shoulder either. . . . Vernon will require no further treatment at this point." R. 468.

Vernon returned to Dr. Reynolds on April 17, 2014, reporting "pain on the lateral aspect of the right wrist at the base of the thumb." R. 471. Dr. Reynolds injected Vernon's right wrist with Celestone. R. 473.

Vernon followed up with Dr. Reynolds on October 28, 2014. R. 472, 474. Vernon explained that the injection he received in April 2014 for his right wrist "didn't help at all." R. 472. Vernon reported pain in his back, neck, ankles, knees, wrists, elbows, and shoulders. Id. Vernon also reported that his big toes become numb due to his previous surgery. Id. Dr. Reynolds prescribed Gabapentin subject to gradual increase and Norco and continued Vernon on his current medications. R. 474.

On February 11, 2015, Vernon saw Brian S. Yee, D.O., for pain management. R. 512. Vernon explained that his pain extends from his back down through his left leg, and that he has numbness in his left leg which can reach all the way down to his foot. Id. Physical examination revealed full lower extremity range of motion with near-full strength. R. 514. Dr. Yee diagnosed Vernon with lumbar degenerative disc disease, lumbago, chronic pain syndrome, and lumbar radiculopathy. R. 514. Dr. Yee ordered an MRI and prescribed Nabumetone. R. 512. The MRI

7

revealed degenerative disc disease at all levels except L3-4, a narrow spinal canal, postsurgical changes with fusion at L4, L5, and S1, and no frank neural foraminal stenosis or spinal stenosis. R. 523.

Vernon followed up with Dr. Yee in March, April, and May 2015. On March 25, 2015, Dr. Yee recommended that Vernon receive injections in his spine and continue to take his prescription medications. R. 520. Vernon received injections on April 16, 2015, May 6, 2015, and May 28, 2015. R. 524–29.

Vernon returned to Dr. Yee on June 24, 2015 to give an update on his condition after the injections. R. 516–17. Dr. Yee stated that Vernon had "maybe[ a] 10% improvement for a very short period of time. His pain is currently rated to be 3 out of 10 in severity on a visual analog scale. He continues with the use of his pain medications twice daily, with some improvement." R. 516. Dr. Yee diagnosed chronic pain syndrome, post lumbar laminectomy syndrome, lumbar radiculopathy, and unspecified nerve root plexus disorder. R. 517. Dr. Yee explained that Vernon will be considered for spinal cord stimulation. Id.

**Medical Opinions**

On November 19, 2013, state agency physician Joseph Duckwall, M.D., explained at the initial level of administrative review that Vernon had the functional capacity to engage in a limited range of light work as follows: (1) frequently lift and carry 10 pounds and occasionally lift and carry 20 pounds; (2) sit, stand, and walk for about six hours in an eight-hour workday; (3) only handle limited pushing and pulling in the upper and lower extremities; (4) frequently balance, kneel, and crouch; (5) occasionally stoop and climb ramps and stairs; (6) never crawl or climb ladders, ropes, or scaffolds; (7) is limited in reaching overhead but has no restrictions in handling, fingering, and feeling; and (8) not work jobs near vibrations or hazards such as

8

machinery and heights. R. 86–88. On July 16, 2014, at the reconsideration level of administrative review, state agency physician Joseph Familant, M.D., largely concurred with Dr. Duckwall's conclusions, but concluded that Vernon can occasionally kneel, crouch, and crawl and is limited in reaching overhead with the right extremity only. R. 102–04. The ALJ gave great weight to the opinions of the state agency physicians as to Vernon's functional abilities.

**Severe Impairments**

The ALJ found that Vernon has severe impairments associated with degenerative disc disease following the cervical and lumbar fusion surgeries, obesity, hypertension, and situational depression. Vernon takes issue with the ALJ's failure to find as severe his left shoulder impairment, leg pain and numbness, chronic pain, and right wrist and thumb impairments.

A "severe impairment" is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). A severe impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques," not "[the claimant's] statement of symptoms, a diagnosis, or a medical opinion." 20 C.F.R. § 404.1521. An impairment is not severe if it causes only "a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis removed) (quoting Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984)). While the failure to list an impairment as severe at Step Two does not necessitate a remand, the ALJ must still "discuss all of the medical evidence." McClain v. Colvin, No. 1:12CV1374, 2014 WL 2167832, at *4 (M.D.N.C. May 23, 2014) (citations omitted).

The ALJ discussed Vernon's right wrist tenosynovitis and left shoulder inflammation of the sternoclavicular joint. The ALJ found that these impairments were not "severe," explaining that:

> [d]espite seeking and receiving treatment for these impairments, [Vernon] failed to allege any limitations, physical or otherwise, stemming from them during the disability hearing. Although [Vernon] underwent a right wrist corticosteroid injection in April 2014, there are no indications from the evidence of record that these impairments, alone or in combination, have had more than a minimal effect on [Vernon's] functional capabilities for the twelve month durational requirement of the regulations. Therefore, the above-listed impairments are considered nonsevere.

R. 38 (internal citation omitted). Thus the ALJ determined that these conditions did not meet the requirements to qualify as severe impairments. More importantly, the ALJ found at Step Two that Vernon suffered from certain severe impairments requiring that the analysis of Vernon's disability claim proceed through the five-step process.

The ALJ reviewed the medical evidence of record regarding Vernon's back pain, including the records from Drs. Burt, Reynolds, Sutton, and Yee. These records included Vernon's complaints regarding pain in his low back, SI joint, and left leg. The ALJ analyzed the MRIs of Vernon's low back, which showed minimal difficulties. Additionally, the records showed that Vernon had experienced excellent results from his left-sided SI joint injections. The ALJ explained that the records of Drs. Sutton and Morin showed that he had good upper extremity and grip strength and that Dr. Morin's records showed that Vernon no longer had shoulder pain and did not require treatment. Additionally, the medical records with Drs. Sutton and Morin between November 2013 and March 2014 explained that sacroiliac joint injections significantly improved Vernon's shoulder pain and showed that Vernon had good shoulder movement upon examination. R. 43.

The ALJ adequately discussed Vernon's right wrist impairment at Step Two. There are only two instances in the record which pertain to Vernon's right wrist impairment. The ALJ cited the April 2013 appointment with Dr. Reynolds, where Vernon first reported pain in his right wrist and subsequently received an injection to combat the pain. R. 38. The ALJ did not discuss the October 2014 record where Vernon reported continued wrist pain to Dr. Reynolds, but no medical action was taken. R. 472.

Finally, the ALJ properly considered Vernon's chronic pain syndrome and leg and foot impairments. Although Vernon reported leg pain, numbness, burning, and weakness, physical examinations of his lower extremities were consistently normal, and Vernon was able to work, do physical therapy, and exercise during the relevant period. The ALJ never explicitly discussed chronic pain syndrome, but his expansive discussion of Vernon's chronic back pain sufficiently incorporated chronic pain syndrome. Moreover, Dr. Yee diagnosed Vernon's chronic pain syndrome and lumbar degenerative disc disease and lumbar radiculopathy and provided pain management for his back pain. The ALJ incorporated the functional limitations from these conditions into the RFC. As such, I find that the ALJ considered Vernon's chronic pain and back impairment in developing the RFC.

The ALJ also accounted for the various limitations Vernon claimed from his non-severe impairments in the RFC. The ALJ incorporated into the RFC the state agency doctors' recommendation to limit the extent Vernon pushes and pulls with his upper extremities. Further, the ALJ included in the RFC the extent that Vernon would climb ropes, ladders, and scaffolds and the amount he could climb, stoop, kneel, crouch, and crawl.

In all, substantial evidence supports the ALJ's discussion of Vernon's shoulder pain, right wrist impairment, leg and foot impairments, and chronic pain stemming from degenerative disc

disease. The ALJ fulfilled his duty to consider Vernon's severe and non-severe impairments in developing the RFC.

**Credibility[4]**

Vernon claims that the ALJ improperly discounted his subjective allegations of pain.

Vernon completed a function report on July 17, 2013, explaining that he is able to watch television, use a computer, shop for groceries, prepare simple meals, mow the lawn, perform minor household repairs, visit his girlfriend, go out to eat, and perform household chores such as laundry and cleaning, and driving. R. 213–17. Vernon stated that his impairments limit his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, concentrate, and remember. R. 218.

At the administrative hearing, Vernon testified that he could only sit for 20 to 30 minutes before having to stand up and could only stand for 10 to 15 minutes before having to sit. R. 58, 61. Vernon described his pain as a "dull ache" that he rated as a 3/10 on average. R. 62.

It is for the ALJ to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Vernon's subjective allegations of his disabling symptoms and impairments are not conclusive on their own; rather, subjective complaints and statements of symptoms, like all other evidence of disability, are considered in the context of the record as a

---

[4] In March 2016, the Social Security Administration superseded its policy on assessing the credibility of a claimant's statements, and ruled that "credibility" is not appropriate terminology to be used in determining benefits. See SSR 16-3p, 2016 WL 1119029 (S.S.A. Mar. 16, 2016). "[W]e are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term." SSR 16-3p at *1. "In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character." Id. Thus, under SSR 16-3p, the ALJ is no longer tasked with making an overarching credibility determination and instead must assess whether the claimant's subjective symptom statements are consistent with the record as a whole.

Here, SSR 16-3p was issued after the ALJ's consideration of Vernon's claim, and both the ALJ's opinion and the parties' briefs speak in terms of a "credibility" evaluation. Accordingly, I will analyze the ALJ's decision based on the provisions of SSR 96-7p, which required assessment of the claimant's credibility." See Keefer v. Colvin, No. CV 1:15-4738-SVH, 2016 WL 5539516, at *11 (D.S.C. Sept. 30, 2016); Ford v. Colvin, No. 2:15-CV-05088, 2016 WL 5171986, at *5 (S.D. W. Va. Sept. 21, 2016); Hose v. Colvin, No. 1:15CV00662, 2016 WL 1627632, at *5 (M.D.N.C. Apr. 22, 2016).

whole. See 20 C.F.R. § 404.1529. If a claimant's statements are inconsistent with other evidence, the ALJ may find them less than fully credible and weigh them accordingly. See SSR 96-4p; SSR 96-7p.

The ALJ discussed Vernon's subjective reports of pain and disabling symptoms and provided a detailed narrative discussion of Vernon's medical history both prior to and during the relevant period. The ALJ did not omit any relevant evidence in this discussion. The ALJ concluded that Vernon's impairments could reasonably cause his alleged symptoms, but found that his subjective allegations were inconsistent with the objective medical evidence. R. 41. The ALJ complied with the Craig factors used to determine the consistency of a claimant's allegations by discussing and citing to the relevant evidence in the record, which includes an analysis of the claimant's daily activities. See Taylor v. Astrue, No. 7:10–CV–149–FL, 2011 WL 2669290, at *2 (E.D.N.C. July 7, 2011) ("The ALJ must consider the entire record in making [a credibility] determination. . . . In addition to the objective medical evidence, the ALJ must consider a number of enumerated factors, such as the effect of symptoms on the claimant's daily life activities and the location, duration, frequency, and intensity of plaintiff's pain or other symptoms.") (internal citations omitted).

The ALJ explained that:

> [i]n terms of [Vernon's] alleged symptoms, the degree of severity alleged lacks support and consistency with the other evidence of record. . . . [Vernon] alleges that he is in constant pain; however the limited degree of treatment required and relatively benign physical examinations during the period at issue belie allegations of disabling symptoms or functional limitations.

R. 44. Vernon's treatment has been conservative and effective, consisting of injections, medication, and physical therapy. Id. Physical examinations during the relevant period were

13

consistently normal, and Vernon never required invasive or aggressive treatment. Id. The ALJ discussed Vernon's daily activities such as preparing meals, driving, using the computer, mowing the lawn, and performing some household chores, concluding that Vernon's impairments "would not prevent him from doing work within the residual functional capacity." Id.; see also Dolfax v. Astrue, No. 7:09-cv-67, 2010 WL 1488116, at *11 (E.D.N.C. Mar. 18, 2010) (finding that activities of daily living are a highly probative factor in determining the credibility of a claimant's allegations (citing Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986))).

I must give great weight to the ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). I find that the ALJ's determination of the consistency of Vernon's statements regarding the severity of his symptoms in light of the objective medical evidence is supported by substantial evidence.

**New Evidence**

The Appeals Council accepted as part of the record a January 6, 2016 opinion from family nurse practitioner Jill Snider regarding Vernon's functional limitations and a letter from Vernon responding to the ALJ's opinion. Vernon argues that this new evidence necessitates remand.

The regulations permit a claimant to submit "new and material evidence" to the Appeals Council. 20 C.F.R. § 404.970(b). Evidence is new if it is not duplicative or cumulative and material if there is a reasonable possibility it would have changed the outcome of the Commissioner's decision. Meyer v. Astrue, 662 F.3d 700, 705 (4th Cir. 2011) (citing Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991)). In any event, the

evidence must "relate[] to the period on or before the date of the [ALJ's] hearing decision." Id. at 704–05 (citing 20 C.F.R. § 416.1470(b)).

Once the Appeals Council accepts the new evidence as it did here, the Court must "review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the [Commissioner's] findings." Wilkins, 953 F.2d at 96. "However, the Fourth Circuit has also admonished that it is the role of the ALJ, and not reviewing courts, to resolve conflicts in the evidence." Davis v. Barnhart, 392 F. Supp. 2d 747, 751 (W.D. Va. 2005) (citing Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996)). Thus, when faced with new evidence, the Court must reconcile its duty under Wilkins to review the entire record, including the new evidence, to determine if there is a reasonable possibility that it would change the outcome, with its obligation under Smith to abstain from making credibility determinations and resolving factual conflicts. See id. Upon review of records that were before the ALJ and were submitted to the Appeals Council, the court must determine whether substantial evidence supports the ALJ's decision and whether the submitted evidence may change the ALJ's conclusion. See Hollar v. Comm'r Soc. Sec. Admin., 194 F.3d 1304, at *2 (4th Cir. 1999) (citing Browning v. Sullivan, 958 F.2d 817, 822–23 (8th Cir. 1992)).

On January 6, 2016, Jill Snider, FNP, answered a physical residual functional capacity questionnaire and explained that Vernon's range of motion in his cervical and lumbar spine is "severely limited." R. 531. Nurse Snider stated that narcotic medication has caused drowsiness. Id. Nurse Snider explained that Vernon can sit for 30 minutes at one time and for two hours in an eight-hour work day and can stand for 10 to 15 minutes at one time and for less than two hours in an eight-hour workday. R. 532–33. Nurse Snider stated that Vernon's pain would frequently interfere with his attention and concentration. R. 532. Nurse Snider explained that Vernon can

(1) occasionally turn his head left or right, hold his head still, crouch, squat, and climb stairs; (2) rarely look down, look up, or twist; and (3) never stoop or climb ladders. R. 534. Nurse Snider stated that Vernon would miss more than four days of work per month. Id.

Nurse Snider's opinion relates back to the relevant period, as it is an opinion given before the ALJ's decision and which summarizes Vernon's complaints, his diagnoses, and the effects his impairments have on him. Nurse Snider's opinion is new as it is not duplicative or cumulative of any treatment notes or opinion in the record. However, Nurse Snider's opinion is not material, as there is no reasonable possibility that it would have altered the ALJ's decision. The ALJ explained that objective medical evidence indicates conservative, effective treatment and consistently normal physical examinations. The ALJ discussed Vernon's daily activities in concluding that he is not unable to perform a range of light work. Nurse Snider is not an "acceptable medical source," and she imposes restrictions that are inconsistent with the objective medical evidence of record. Palmer v. Colvin, No. 5:13–CV–126–BO, 2014 WL 1056767, at *2 (E.D.N.C. Mar. 18, 2014) ("[A] nurse practitioner is not an acceptable medical source under 20 C.F.R. 404.1513(d)(1)."); see also SSR 06-03p (explaining that an ALJ must evaluate the opinion of one who is not an acceptable medical source according to the following factors: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion). Accordingly, I do not find that there is a reasonable probability that Nurse Snider's opinion would provide a basis for changing the ALJ's decision.

## RECOMMENDED DISPOSITION

It is not the province of the court to make a disability determination. The court's role is limited to determining whether the Commissioner's decision is supported by substantial evidence, and in this case, substantial evidence supports the ALJ's opinion. The ALJ properly considered all of the objective and subjective evidence in adjudicating Vernon's claim for benefits and in determining that his physical impairments would not significantly limit his ability to do a range of light work. Accordingly, I recommend that the Commissioner's decision be affirmed, the defendant's motion for summary judgment be **GRANTED**, and Vernon's motion for summary judgment be **DENIED**.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, Chief United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation which must be filed within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection, including a waiver of the right to appeal.

Enter: August 20, 2018

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge